# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

| JEFFERY FRANCOIS | * | CIVIL ACTION NO. 05-0457 |
|---|---|---|
| VERSUS | * | JUDGE MELANÇON |
| COMMISSIONER OF SOCIAL SECURITY | * | MAGISTRATE JUDGE HILL |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Jeffrey Francois, born May 3, 1955, filed an application for disability insurance benefits on December 6, 2000, and an application for supplemental security income payments on November 1, 2000, alleging disability as of August 25, 1999, due to emphysema and arthritis.[1]

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial evidence in the record to support the Commissioner's decision of non-disability.

---

[1]Claimant filed a previous application for disability benefits, in which he was awarded benefits for a closed period between April, 1995 and April, 1997. He filed a subsequent application, which was denied by an Administrative Law Judge's decision on August 24, 1999. No further appeal was taken.

*Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions regarding claimant's disability is not supported by substantial evidence, based on the following:

**(1) Records from Crowley Mental Health Center dated January 11, 2001 to November 20, 2003**.  On January 11, 2001, claimant was admitted for major depressive disorder, single episode, severe.  (Tr. 113).  He was prescribed Remeron.  (Tr. 114-15).  His Global Assessment of Functioning Scale ("G.A.F.") score was 45.  (Tr. 113).

On June 5, 2002, claimant was diagnosed with major depressive disorder, recurrent.  (Tr. 188).  His G.A.F. score was 49.

In 2003, claimant's medications included Clonidine, Wellbutrin, Trazodone, and Inderal.  (Tr. 187).

**(2) Report from Dr. Reginald Segar dated February 1, 2001**.  Dr. Segar reported that he had first treated claimant on December 21, 2000, for complaints of a rash, shortness of breath, wheezing, and dizziness after a train derailment in Eunice.  (Tr. 116).  He smoked and had asthma.  On examination, he had some red papular on his arms, trunk, and legs.  He also had some wheezing and congestion in his sinuses.

Dr. Segar instructed him to leave the area and quit smoking. He prescribed medications.

Claimant returned on January 29, 2001, with a worsening of his rash. He was referred to a dermatologist. Dr. Segar noted that claimant had respiratory and lung problems, as well as the rash. He had not seen claimant for any depression or arthritic problems.

**(3) Consultative Internal Medicine Examination by Dr. Samuel J. Stagg, Jr., dated April 23, 2001**. Claimant gave a history of having emphysema, asthma, and Wolff-Parkinson-White syndrome. (Tr. 118). He remained short of breath, which worsened in the summer. Additionally, he complained of joint pain and arthritis. He reported that he had not smoked in 10 months. He was on no medication at that time. (Tr. 119).

On examination, claimant was somewhat dyspneic, and his shortness of breath increased as he talked. He got in and out of a chair with a little difficulty, and walked with a rather rigid lumbosacral spine and a slight limp of the right leg.

Claimant's lungs revealed inspiratory and expiratory wheezing bilaterally. His heart had a sinus rhythm, with no murmurs, rubs, or thrills. He had no apparent clinical cardiac enlargement, and good heart tones.

Claimant had no edema of the extremities. Pulses and reflexes were normal. He had no apparent muscle weakness or atrophy. Grip, dexterity, grasping, and range of motion of the upper extremities were normal.

Straight leg raising was normal. Claimant had some limitation of motion of the right hip. He had normal range of motion of the knees. There was no clubbing or cyanosis of the digits. Vibratory and fine touch sensations were normal.

Claimant was unable to walk on his toes or heels because of hip and knee pain. He could flex the lumbar spine 80 degrees, laterally bend 10 degrees, and extend 5 degrees. He had no muscle spasm.

Chest x-rays showed a CT ratio of 14/34 ½ centimeters. The heart shadow was normal. The lungs were slightly hyperaearated with some chronic fibrotic changes bilaterally.

Dr. Stagg's impression was chronic pulmonary disease and arthritis of undetermined etiology. He noted that claimant really had no swollen joints at that time. He did have some synovial thickening of the digits of his hands.

**(4) Pulmonary Function Study by Dr. John W. Stafford dated June 14, 2001**. Claimant gave a history of arthritis, heart ailments, and emphysema. (Tr. 123). He was not on any medications. He claimed to be a non-smoker, quitting approximately one year prior. The results were abnormal at below 70%. Two puffs

of Proventil HFA were self-administered prior to post-bronchial testing, and his values improved.  His FEV1 trials measured 3.24, 3.02, and 3.36.  (Tr. 124).

**(5) Psychiatric Review Technique Form dated June 27, 2001**.  Dr. R. H. Rolston evaluated claimant for major depressive disorder in remission.  (Tr. 137).  He determined that claimant had no functional limitations.  (Tr. 147).

**(6) Residual Functional Capacity ("RFC") Assessment dated July 9, 2001**. The examiner determined that claimant had no physical limitations.  (Tr. 153-56).  He recommended that claimant avoid even moderate exposure to smoking, fumes, odors, dusts, gases, and poor ventilation because of chronic respiratory problems.  (Tr. 156).

**(7) Records from W. O. Moss Regional Hospital dated December 6, 2001 to July 3, 2002**.  On December 6, 2001, claimant was admitted after he had passed out.  (Tr. 174).  Chest x-rays were normal.  (Tr. 175).  The assessment was syncope, smoker for 39 years, and shortness of breath.

On January 7, 2002, claimant reported that he smoked marijuana for pain in both knees.  (Tr. 172).  He also smoked one-half to two packs of cigarettes per day. The diagnoses at that time were seizure disorder, chronic obstructive pulmonary disease, depression, tobacco abuse disorder, and osteoarthritis of the knees.  He was given an inhaler.  A CT scan of the head was normal.  (Tr. 171).

A pulmonary function report showed a mild obstructive lung defect. (Tr. 170). Claimant had a significant response to the bronchodilator.

On February 7, 2002, claimant was seen for complaints of constant pain to the back and knees since 1992. (Tr. 166-67). Knee x-rays showed early minimal degenerative osteoarthritis. (Tr. 167). Lumbar spine x-rays revealed minimal degenerative osteoarthritic changes.

On March 15, 2002, claimant reported that he thought that he was about to have a seizure, but none developed. (Tr. 165). He was prescribed Neurontin. His blood pressure was elevated. The diagnoses were COPD, seizure disorder, osteoarthritis, depression, hypertension and liver disease.

An abdominal ultrasound of the liver dated March 26, 2002, revealed borderline splenomegaly. (Tr. 163). Hepatitis testing revealed no Hepatitis A infection. (Tr. 164).

On July 3, 2002, claimant complained that his shortness of breath was worsening. (Tr. 161). He was advised to stop smoking. He was treated with medications.

**(8) Psychological Evaluation by Dr. Alfred Buxton dated July 2, 2003**.

Claimant complained that his mental health or nerves were "not too good right now." (Tr. 179). He had been going to the Crowley Mental Health Center for the previous

two years on a monthly basis. His medications included Clonidine, Neurontin, Trazodone, Wellbutrin, Propanolol, and inhalers for emphysema.

Claimant's sleep was restless and disturbed with frequent awakening secondary to pain. His appetite was fair, energy was poor, and libido was poor. Socially, he was mostly at home. His ability to cook, clean, and shop were reduced due to physical problems. He was able to manage money, communicate, and manage time independently. He was dependent in his travel needs secondary to his altered state of consciousness and physical problems.

On examination, claimant occasionally changed postural position as if he were in pain and discomfort. His verbal receptive and expressive language skills, dress and groom, and social skill were good. Recent and remote memories were intact. Ability to attend and concentrate was good. Pace was even. Judgment, reasoning and reflective cognition were good.

Claimant's insight was fair. (Tr. 180). His cognitions were clear and cogent. His mood was dysphoric with congruent affect. He reported passive suicidal ideation. His self-image was poor with low self-esteem. Goal orientation was fair. He was alert, responsive, and oriented in all four spheres.

Administration of the Wechsler Adult Intelligence Scale-III yielded a full scale IQ of 87, verbal score of 88, and performance score of 87. He was of dull normal or

low average intellect with commensurate adaptive daily living skill development, although there had apparently been some compromise secondary to chronic physical health problems. He was regarded as being competent as a manager of his own personal affairs.

Clinically, claimant presented with a major depressive disorder, single episode, without psychotic features, with degree of impairment moderate and prognosis fair; maladaptive health behavior negatively affecting medical condition due to his cigarette smoking relative to a history of emphysema, and chronic pain, with degree of impairment severe and prognosis guarded. Dr. Buxton determined that continued outpatient mental health intervention service would be appropriate, as would continued medical monitoring and management of his heart problems, arthritis, emphysema, and syncope episodes. Claimant's G.A.F. score was 55, with the rating period being over the last 12 months.

Dr. Buxton opined that "[i]t is highly unlikely he could secure much less maintain gainful competitive employment given his current functional difficulties." He noted that claimant certainly would not perform in a reliable and dependable fashion for a brief period of time, much less for a protracted period. (Tr. 181). He stated that claimant would not deal well with the frustration and stress he would encounter in the job setting, and that it would cause exacerbation in overall

symptomatology. Dr. Buxton thought that at a minimal level, claimant should be able to establish and maintain mutually rewarding relationships with co-workers and supervisors alike. He determined that claimant's rehabilitative potential seemed to be "somewhat poor" at that time.

In the Medical Source Statement of Ability to do Work-Related Activities (Mental), Dr. Buxton determined that claimant had a slight degree of limitation as to his ability to understand, remember, and carry out short, simple instructions, and to interact appropriately with the public, supervisors and coworkers. (Tr. 183-84). He found that claimant was moderately limited as to his ability to understand, remember, and carry out detailed instructions, and make judgments on simple work-related decisions. (Tr. 183). Dr. Buxton opined that claimant was markedly limited as to his ability to respond appropriately to work pressures in a usual work setting, or respond appropriately to changes in a routine work setting. (Tr. 184).

**(9) Report from Dr. Reginald Segar dated January 21, 2004**. Dr. Segar reported that claimant had severe joint and muscle pain secondary to arthritis and fibromyalgia. (Tr. 194). He stated that the pain had been so severe that claimant had not be able to work since 1993, and was currently unable to handle leaving his home. He noted that claimant walked with a cane, and also used a wheelchair and scooter to get around. Additionally, he wrote that claimant suffered from hypertension,

chronic obstructive pulmonary disease, seizures, Wolff-Parkinson-White heart disease, abnormal liver scans, and major depressive disorder. At that time, claimant was taking Clonidine, Propranolol, Bupropion SR, Trazodone HCL, Combivent Inhaler, Serevent Inhaler, Albuterol Inhaler, Advair Inhaler, Celexa, Singulair, Vioxx, Neurontin, and Lotrel.

Dr. Segar opined that "I am totally convinced and it is my medical opinion that due to the medical problems that exist, Mr. Francois is unable to engage in any gainful employment, and is totally disabled, and will remain so disabled for a period in excess of one (1) year and I believe for the remainder of his life. He has been totally disabled since 1993."

**(10) Consultative Orthopedic Examination by Dr. Raymond F. Taylor dated April 27, 2004**. Claimant complained of "pain all over," particularly in the joints. (Tr. 195). He also complained of low back pain, shortness of breath, a history of cigarette smoking, seizures, and hypertension. He denied any history of alcohol or drug abuse. (Tr. 196).

On examination, claimant was 70 inches tall and weighed 190 pounds. (Tr. 197). His blood pressure was 153/92. His heart demonstrated a regular sinus rhythm without murmurs, normal heart sounds, and normal peripheral pulses. Lungs were clear to auscultation and percussion, and breath sounds were normal.

On musculoskeletal exam, claimant's range of motion of the neck was normal. Range of motion of the back was 0 to 20 degrees in extension, and 0 to 80 degrees in forward flexion. Range of motion of lateral flexion was 0 to 30 degrees. (Tr. 198). Claimant had no muscle spasm or tenderness. Straight leg raising was negative.

Range of motion of the extremities was normal. Claimant had no loss of muscle strength or atrophy. Grip strength was good, and manual dexterity and grasping ability was normal.

Claimant had no swelling, instability, or deformity of the joints. His station was normal, but his gait was "somewhat bizarre" and unexplained by physical findings. He could walk on his heels and toes without difficulty, and an assistive device was not necessary.

On neurological examination, claimant was oriented to time, place, and person. Cranial nerves, motor and sensory nerve function were normal. Deep tendon reflexes were normal.

Psychologically, claimant's behavior was appropriate. His thought content, affect, and mood were normal. Concentrating ability and memory was normal.

Dr. Taylor's impression was "pain all over," etiology unknown; mechanical low back pain, etiology unknown; subjective shortness of breath, possibly secondary

to mild chronic obstructive lung disease; a history of seizures, untreated, etiology unknown, and hypertension.

In the medical source statement, Dr. Taylor noted that claimant had multiple somatic complaints, but there was not much on his physical examination to explain them. (Tr. 199). He observed that claimant took no medication for this. He saw no evidence of end organ damage from hypertension.

Dr. Taylor noted that although claimant's gait was "somewhat bizarre" and not explainable by physical findings, his physical examination was essentially normal. He observed that claimant's history was "fraught with symptom magnification." Based on his physical findings, Dr. Taylor found no reason to limit claimant's work-related activities. (Tr. 199-203).

**(11) Claimant's Administrative Hearing Testimony**. At the hearing on July 14, 2004, claimant was 49 years old. (Tr. 216). He had quit school in the ninth grade. He had served in the Army from June to October, 1973. (Tr. 217). Additionally, he had gone to trade school for diesel mechanics and driving classes, and had attended welding school. (Tr. 222).

Claimant had past work experience in the oilfield. (Tr. 218). He also drove trucks, operated heavy machinery, and worked as a tugboat captain. (Tr. 219). He stated that he had stopped working in 1992 after he became unable to lift things.

Regarding complaints, claimant testified that he had trouble walking and had to use a cane or wheelchair. (Tr. 223). He said that his pain was exacerbated with rain and cold. He reported that he had heart problems, for which he had surgery in 1996. (Tr. 224). Additionally, he had high blood pressure for which he was taking medication. (Tr. 225). He also stated that he was still having seizures. (Tr. 229).

Claimant also reported that the had breathing problems, for which he used inhalants. (Tr. 225). He stated that he used several different inhalers, but could not afford them. (Tr. 225, 234). He complained that he could not exert himself or lift things, because he became exhausted. (Tr. 226).

As to daily activities, claimant testified that he was depressed and did not do anything but "[j]ust sit there." (Tr. 226). He stated that every joint in his body hurt. (Tr. 228). He reported that he drove very little. (Tr. 229).

**(12) Administrative Hearing Testimony of Harris Rowzie, Vocational Expert ("VE")**. Mr. Rowzie classified claimant's past work as a tractor-trailer truck driver as medium and semi-skilled. (Tr. 251). He noted that claimant had some transferable skills from the operation of motor vehicles and marine craft. The ALJ posed a hypothetical in which he asked the VE to assume a claimant of the same age, education, and work experience; who drove minimally; who functioned in the low average range of intellectual functioning; who was diagnosed with major depressive

disorder, maladaptive health behavior negatively affecting medical condition, and chronic pain; who was assessed with a G.A.F. factor of 55; who had only a slight impairment as to his ability to understand, remember, and carry out simple job instructions; who had a moderate impairment as to his ability to make judgments on simple, work-related decisions; who had a slight impairment as to his ability to appropriately react with the public, supervisors, and coworkers; who had a marked impairment as to responding appropriately to work pressures in a usual work setting, and a marked impairment as to responding appropriately to changes in routine work settings. (Tr. 252-53). In response, Mr. Rowzie testified that such claimant could work in miscellaneous food preparation occupations, of which there were 502,000 jobs; janitors and cleaners, of which there were 1,800,000 jobs, and farm workers, of which there were 377,000 jobs. (Tr. 253).

The ALJ posed another hypothetical in which he added the limitations of a person with a mild obstructive breathing problem which occasionally required treating with ventilative medications; who had not worked since 1992, and had spent most of that time in a more or less confined and inactive lifestyle, and had an assessment by a psychologist who opined it was highly unlikely that such claimant could secure, much less maintain, gainful, competitive employment given his current functional difficulties. (Tr. 254-55). In response, Mr. Rowzie noted that such

claimant had not worked in 12 years, and was "deconditioned both mentally or emotionally and physically." (Tr. 255). He opined that "I think that at that point in time it would be virtually impossible to motivate him to return to work." (Tr. 255).

**(13) The ALJ's Findings**. Claimant argues that the ALJ erred: (1) in failing to find that he was disabled; (2) in failing to find that he was disabled for a time and entitled to a closed period of disability benefits, and (3) in finding that claimant's testimony and complaints of pain were not credible. Because I find that the ALJ erred in finding that claimant had the ability to maintain employment, I recommend that the Commissioner's decision be **REVERSED,** and that the claimant be awarded benefits.

In his decision, the ALJ referenced the portion of Dr. Buxton's opinion stating that claimant could not perform reliably in a work place. (Tr. 16). However, the ALJ's summary omits a key point in Dr. Buxton's opinion, namely that "[i]t is *highly unlikely that* [claimant] *could secure much less maintain gainful competitive employment* given his current functional limitations." (emphasis added). (Tr. 180).There is no countervailing evidence in the record. When the ALJ incorporated that portion of Dr. Buxton's opinion into the hypothetical to the vocational expert, Mr. Rowzie opined that because claimant was "deconditioned both mentally or emotionally and physically" after not working in 12 years, "it would be virtually

impossible to motivate him to return to work." (Tr. 255).

The opinions of Dr. Buxton and Mr. Rowzie, both of whom were retained by the Social Security Administration, simply do not indicate that claimant is capable of working on a sustained basis at this time. At the time of Dr. Buxton's evaluation, he determined that claimant's rehabilitative potential seemed "somewhat poor." (Tr. 181). Claimant's G.A.F. score was 55, which indicated moderate symptoms or difficulty in social or occupational functioning, while others in the record were 45 and 49, indicating serious symptoms or impairment in social or occupational functioning. (Tr. 113, 188). Dr. Buxton further found that claimant was markedly limited as to responding appropriately to work pressures in a usual work setting and responding appropriately to changes in a routine work setting. (Tr. 184). There is no evidence pointed to by the ALJ which calls that opinion into question; my review of the medical records fail to disclose any such evidence.

A finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can hold whatever job he finds for a significant period of time. *Watson v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002) (citing *Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986)). According to Dr. Buxton, as well as Mr. Rowzie, both of

whom were retained by the Social Security Administration, claimant would be unable to maintain gainful employment. Thus, the ALJ erred in his determination that claimant retains the capacity for work. (Tr. 21).

Because the ALJ erred in finding that claimant was capable of retaining the capacity for work, the undersigned recommends that the Commissioner's decision be **REVERSED**, and that the claimant be awarded appropriate benefits. The undersigned recommends that August 25, 1999, which is the onset date asserted in both applications, be used as the date for the commencement of benefits.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN**

**AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.** *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, **79 F.3D 1415 (5TH CIR. 1996).**

Signed this 13th day of February, 2006, at Lafayette, Louisiana.

_____
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE